**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

ROBERT ALFRED WILLIS,

    Plaintiff,

v.                                                      ACTION NO. 2:13cv184

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

**UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act and application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference, dated July 24, 2013. This Court RECOMMENDS that the decision of the Commissioner be AFFIRMED.

**I. PROCEDURAL BACKGROUND**

The plaintiff, Robert Alfred Willis ("Plaintiff" or "Willis"), originally protectively filed applications for SSI and DIB on August 28, 2009, alleging he had been disabled since October

15, 2003. R. 211-20, 241, 245.[1] The applications stemmed from bipolar disorder, anxiety, and personality disorder. R. 85, 245. The Commissioner denied Plaintiff's applications, both initially on December 30, 2009, R. 152-61, and upon reconsideration on October 27, 2010. R. 166-71. At Plaintiff's request, a hearing before an Administrative Law Judge ("ALJ") took place on August 24, 2011, at which the Plaintiff and his then-girlfriend, Angela Lane Corprew,[2] testified. R. 54-84. During the course of the hearing, Plaintiff amended his alleged onset date to June 22, 2009, voluntarily withdrawing his request for a hearing on his DIB claim because his disability insured status expired prior to that date. R. 78. On September 2, 2011, the ALJ issued a decision dismissing Plaintiff's DIB claim and granting his claim for SSI based on the revised onset date of June 22, 2009. R. 141-151.

On October 4, 2011, Plaintiff, through counsel, requested a rehearing of his DIB appeal, effectively reopening his claim to DIB, claiming an alleged onset date prior to December 31, 2008.[3] R. 204-05. The request to reopen the hearing was granted on October 5, 2011, R. 206-07, and a hearing was held before another ALJ on December 16, 2011.[4] R. 28-53. At the hearing, the Plaintiff, represented by counsel, and a Vocational Expert ("VE"), testified. *Id*. The second ALJ denied Plaintiff's DIB and SSI claims on February 17, 2012. R. 11-23. On February 12, 2013, the Appeals Council denied Plaintiff's request to review the ALJ's decision, making the ALJ's decision the Commissioner's final decision. R. 1-3.

Having exhausted all administrative remedies, Plaintiff filed a motion on April 11, 2013,

---

[1] Page citations are to the administrative record previously filed by the Commissioner.
[2] In the transcript from the ALJ's first hearing, Ms. Corprew is consistently referred to as Ms. Colburn. However, due to the volume of documents throughout the record that refer to her as Ms. Corprew, this Court will refer to her as such.
[3] Although the request was specifically to reopen the DIB claim, by granting the request for rehearing, the Social Security Administration effectively vacated the entire decision of the first ALJ, including his award of benefits for Plaintiff's SSI claim.
[4] Plaintiff's request for reconsideration did not specify an onset date, stating only an alleged onset date prior to Plaintiff's date last insured. R. 204-05. The ALJ interpreted the alleged onset date to revert to October 15, 2003. R. 15, 17, 23, 32.

to proceed in forma pauperis in this Court (ECF No. 1), which was granted on April 12, 2013 (ECF No. 2). Plaintiff's complaint was then filed with this Court on April 12, 2013. ECF No. 3. Defendant filed an Answer to the Complaint on July 8, 2013. ECF No. 6. On July 26, 2013, an Order was entered directing the parties to file Motions for Summary Judgment. ECF No. 9. Plaintiff's Motion for Summary Judgment was submitted on August 23, 2013. ECF No. 10. Defendant Commissioner's Motion for Summary Judgment was filed on September 20, 2013. ECF No. 12. Plaintiff filed a reply to Defendant's Motion for Summary Judgment on October 10, 2013. ECF No. 14. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1965 and was forty-seven years old on the date of his second hearing in front of the ALJ. R. 22. Plaintiff has a high school education, (R. 22), and his past work included working as a carpenter and construction supervisor. R. 229-36, 246, 260-66. Plaintiff filed his application for SSI and DIB on August 28, 2009, alleging disability as of October 15, 2003,[5] based on bipolar disorder, anxiety, and personality disorder. R. 78, 85, 204-05, 211-20, 245.

### A. Medical Records Relating to Plaintiff's Condition

Medical records between the alleged onset date of October 13, 2003 and Plaintiff's incarcerations are sparse. Records show Plaintiff sought readmission to the Department of Behavioral Healthcare Services for alcohol abuse and depression on March 18, 2005. R. 388. He sought treatment there again on February 14, 2007, for a personality disorder that had been diagnosed on July 1, 2005 and manic depression that had been diagnosed on January 12, 2007.

---

[5] *See supra* note 4.

R. 387. The treatment notes from February 14 indicate that Plaintiff was incarcerated from April 19, 2006 to January 12, 2007. R. 387.

Medical records become more abundant starting from Plaintiff's most recent incarceration, serving an eighteen month prison sentence for Driving with Suspended License, in 2008 and 2009. R. 60, 378. Plaintiff's alleged onset date occurred while he was still incarcerated, and being treated for his bipolar disorder at the Chesapeake City Jail. R. 306-336. On September 18, 2008, Luis F. Ignacio, M.D., opined that Plaintiff stated that "lithium is the only thing that really helps" him control his bipolar disorder. R. 318. The same day, Plaintiff reported to a Certified Substance Abuse Counselor (CSAC)[6] that his medication was causing hand tremors, and that he was staying up for two to three days at a time before "crashing." R. 317. The CSAC reported that Plaintiff was oriented to person, place and time, was alert, had normal mood and affect, had cooperative motor behavior, and had no harmful ideations. *Id*. On October 23, 2008, Plaintiff reported that his medications were working well and stated that he was exhibiting stable behavior and functioning. R. 314. On January 14, 2009, Plaintiff reported he was doing well "for the most part," and had no suicidal ideations, mood swings, hallucinations, or other symptoms. R. 313. He was listed as stable, calm, and cooperative during the January 14 visit. *Id*. On February 25, 2009, Plaintiff indicated that he was "doing fine" on his medication, though he did get medication-related tremors in the morning. R. 311. On March 8, 2009, he reported "problems with his mood and shaking" relating to a medication adjustment, and the CSAC noted that he was anxious, had mood swings, and was shaking. However, on June 10, 2009, Plaintiff's progress notes indicated that he was tolerating his medications well and without any side effects. R. 308.

Upon release from prison, Plaintiff sought treatment at the Portsmouth Community

---

[6] The CSAC's name is illegible in the document.

4

Health Center. R. 354-412. Plaintiff's Client Master Report indicated that he sought a referral on June 24, 2009, for mental health treatment and substance abuse history. R. 382. The Report stated that while at some point Plaintiff had used "some of everything," referring to drugs and alcohol, he had been sober for two years. *Id*. Ali Aziz, M.D., performed a psychiatric evaluation on July 13, 2009. R. 378-80. Dr. Aziz opined that Plaintiff has a history of drug use, but had been clean for ten years, and a history of alcohol abuse but had been sober since entering jail eighteen months prior. R. 378. Dr. Aziz also stated that Plaintiff indicated he had a "history of extreme agitation, irritability, anger, aggression, violence, and getting into fights," and also had "episodes of depression, low energy, concentration, interest, and motivation." *Id*. Dr. Aziz also opined that Plaintiff had "multiple Psychiatric hospitalizations since he was 18 for agitation, aggression, violence and other times for manic episodes and non-compliance with medications." *Id*. During the examination, Dr. Aziz noted that Plaintiff was restless, anxious, irritable and fidgety, and had slight hand tremors. R. 379. He had rapid speech, which was pressured and tangential but he had no "flight of ideas," no suicidal or homicidal ideation, no delusion, and no auditory or visual hallucinations. *Id*. However, Dr. Aziz noted that Plaintiff's attention and concentration were "not well intact." *Id*.

      Progress Notes from February 8, 2011, show that Plaintiff had occasional interrupted sleeping patterns, an irritable mood, and medication side effects of dry mouth, tremors, and polydipsia. R. 405. On July 26, 2011, Plaintiff's Progress Notes indicate relevant thought processes, a "pretty good" mood and affect, no suicidal or homicidal ideations, orientation to time, place and person, impulsive judgment, good energy, a depressed appetite, and an occurrence of dreams and nightmares. R. 402.

      Plaintiff also had several medical evaluations done, in the form of check-off forms, for

Virginia's Department of Social Services. The first was done on April 2, 2007, by Curtis Bryan, M.D., indicating that Plaintiff was unable to work for a duration of six months, due to bipolar disorder. R. 368-69. The second form was also completed by Dr. Bryan, on August 6, 2007, indicating the Plaintiff was unable to work for a duration of twelve months, due to bipolar disorder. R. 366-67. The third was completed by Dr. Aziz, on July 13, 2009, indicating Plaintiff was unable to work for twelve months due to a diagnosis of bipolar disorder and a history of alcohol dependence. R. 364-65. The fourth was completed on June 16, 2010, by A.S. Navarre, M.D., indicating that Plaintiff was unable to work for twelve months, and diagnosed bipolar disorder and a history of alcohol dependence. R. 362-63. The fifth was also completed by Dr. Navarre on May 3, 2011, indicating that Plaintiff was unable to work for a period of twelve months, due to bipolar disorder and a history of alcohol dependence. R. 360-61.

State Agency Physicians reviewed Plaintiff's medical records and made determinations regarding Plaintiff's ability to perform work. Stonsa N. Insinna, Ph.D., LCP determined, in a report dated December 28, 2009, that Plaintiff had a primary diagnosis of an affective disorder, and a secondary diagnosis of substance addiction disorders. R. 89. Dr. Insinna opined that Plaintiff's "overall functioning is mildly-to-moderately limited," R. 90, 92-93, finding Plaintiff was not significantly limited in ability to remember locations, understand and carry out short and simple instructions, perform activities within a schedule, sustain an ordinary routine, make simple work-related decisions, interact appropriately with the public, ask simple questions, and maintain socially appropriate behavior; and moderately limited in ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and get along with

coworkers or peers without distracting them or exhibiting behavioral extremes. R. 91-93. Dr. Insinna opined that Plaintiff should be limited to simple, routine work. R. 94. Dr. Insinna also reported identical findings in a report for Plaintiff's initial claim, also dated December 29, 2009. R. 105-07.

Daniel Walter, Psy.D., LCP, made substantially similar findings in his reports dated October 25, 2010. R. 118-120, 132-34. Case analyst Patricia Staehr, M.D., determined that Plaintiff did not have severe physical impairments. R. 116, 130.

### B. Statements by Plaintiff Regarding his Condition

#### 1. Function Reports and Applications for Social Security

Plaintiff first filled out a Function Report on October 23, 2009. R. 252-59. In it, he indicated that he could not focus, concentrate, or work full time with his condition. R. 253. He also stated that he had trouble sleeping, and that without medication he could not sleep or would only get one to two hours of sleep. *Id*. He also stated that some days he did not leave the house, and that he needed his medication in order to stay "halfway focused" during the day. R. 253-54. Regarding meals, Plaintiff opined that he prepared basic food such as soups, sandwiches and t.v. dinners two to three times a day, but that he used to cook three-course meals for a family of six. R. 254. Regarding yard work, he stated that he could not complete any outdoor chores because he is unfocused. R. 254-55. Plaintiff opined that he did not go outside except for regular doctor's appointments, because he has a "hard time relating to people," and "everything seems to upset" him, including cashiers and the presence of other people. R. 255. He stated that he watched television with his girlfriend for fun, and that he no longer read, even though he used to enjoy reading, because he kept reading the same page over and over. R. 256. He indicated that he had problems relating to people, because he had trouble focusing on conversations, he felt like

everyone was out for themselves, at his expense, and he did not "care for people in general." R. 257. He also opined that he did not finish what he started or follow written instructions well, because he could not remember the first part when he finished reading it; however, if the instructions were written and simple, he could likely follow them. *Id*.

Plaintiff filled out a second function report on April 26, 2010. R. 283-290. In it, he stated that he had hourly interrupted sleep. R. 284. He also opined that he would not maintain a personal care ritual or remember to take his medication without the help of his girlfriend. R. 284-85. He also stated that he could not focus to perform tasks like cooking, laundry, and other house and yard work. R. 285. He did not shop often because he had trouble handling people or crowds. R. 286. He indicated that he was able to pay bills, count change, handle a savings account, and used a checkbook or money order, but that he did not have any money so it is easy. R. 286-87. Regarding his ability to interact with others, Plaintiff stated that he hated everyone, though he used to get along well with others. R. 288. He also stated that he was constantly frustrated, and that he had developed a "potty mouth." *Id*. He indicated that he could not follow written or spoken directions, because he "cannot comprehend what goes first" and that sometimes he hears different things than what was actually spoken. *Id*. He opined that he now fears the outdoors, he swears too much, he talks to himself, and he "get[s] mean easy." R. 289.

### 2. Testimony Before the ALJ

At his first administrative hearing on August 24, 2011, Plaintiff testified that he lived with his girlfriend and her mother. R. 58. He testified that he completed the tenth grade in high school, but that he earned a GED when he was in prison. R. 59-60. He stated that he had been in prison three times, and incarcerated several times, usually when he was not taking medication for his bipolar disorder. R. 60. Plaintiff also indicated that he had an alcohol problem, but that he

had been sober for five or six years. R. 60-61.

In relation to Plaintiff's employment history, he testified that he was a head carpenter for a government contract with JD and W, and he holds a special license as a certified general carpenter. R. 63-64. After that, Plaintiff testified that he served as a superintendent for a commercial building operation, but that he took a leave of absence starting in 2003 because he and his wife were having marital problems that culminated in her taking their four children to North Carolina, he believed illegally. R. 61-62.

In relation to Plaintiff's symptoms, he opined that he has problems with memory that cause him to make errors in everyday household actions, including adding bleach to the wrong laundry and burning food on the stove. R. 64-65. He does not go out often and interact with others, because he frequently forgets what he is doing or saying. R. 66. Plaintiff does not drive, by choice, because of his health problems. R. 71. Plaintiff testified that he gets irritable when he is out in public, and does not like crowds. R. 72. He also does not have the desire to interact with other people, aside from his children when they call. R. 74.

On a typical day, Plaintiff testified that he sleeps often, and may do light housework such as vacuuming and dishes, or work out. R. 73-74. He described his typical day as waking up at eight o'clock, eating breakfast, taking his medication, watching television, sleeping around two thirty or three o'clock, watching television, taking his medication, and going to bed. R. 66, 77. He stated that he could not read books, watch long movies, or follow sports, because he could not concentrate for a long enough period of time to remember what happened. R. 74-75. He testified that he felt sleepy a lot, and that he slept for two to three hours in the afternoon every day. R. 76-77.

Plaintiff's then-girlfriend, Angela Lane Corprew, also testified on his behalf. She

testified that he could not do much to help around the house, especially after he took his medicine. R. 80. She also stated that he slept for more than half the time between eight o'clock and five o'clock, and he could not help with cooking, cleaning, or other household chores such as cutting grass and weeding. *Id*. She testified that Plaintiff did not have temper issues, as long as he regularly took his medication, but that the medication made him "non-functional." R. 81.

At his second administrative hearing on December 16, 2011, Plaintiff testified that his daily routine had not changed much since the previous administrative hearing. R. 37. He testified that he had a history of both drug and alcohol use, but he had not drunk alcohol, used cocaine or smoked marijuana for about five years. R. 38-39. To illustrate the concentration problems he has while on his medication, Plaintiff discussed a time where he tried to mow the lawn, but went to move something and forgot he had the lawnmower running, so he went inside, leaving the lawnmower outside and on. R. 40-41. He also recalled an incident attempting to cook bacon using the stovetop, where he forgot the bacon and accidentally started a grease fire. R. 42. He indicated that he slept for at least four hours of a standard eight o'clock to five o'clock workday. R. 42. He testified that he did not remember why he was last incarcerated, though he believed it was for assault, but that during that time period, he was having anxiety attacks four to five times a day. R. 45. He also testified that he and his girlfriend were no longer together, and that he was now living with friends. R. 47.

A Vocational Expert ("VE") also testified at the hearing. The VE testified that an individual with Plaintiff's characteristics with a restriction to work only simple, routine, unskilled work of only one or two steps, low stress defined as no production paced work and occasionally interaction with the public, coworkers, and supervisors could not perform any of Plaintiff's past work. R. 49. The VE stated that such an individual could perform such jobs as

10

meter reader or building cleaner, both of which are unskilled and light; however, if the individual would be off task for twenty percent of the time, there would be no job in the national economy available to that individual. R. 49-50. Additionally, in response to questioning by the Plaintiff's attorney, the VE testified that there were positions in the national economy for an individual with frequent memory lapses for routine instructions, but there were not positions in the national economy for that individual if they also were to get into frequent disagreements with supervisors, co-workers, or the public. R. 51.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76

F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a

condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents him from past relevant work, and (5) has an impairment that prevents him from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

In reviewing the record, the Court RECOMMENDS that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED and the decision of the Commissioner be AFFIRMED.

**A. ALJ's Decision**

In this case, the ALJ found the following regarding Plaintiff's condition. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2008. R. 17. First, fulfilling Step 1, Plaintiff did not engage in substantial gainful activity since October 15, 2003. R. 17. Second, Plaintiff's bipolar disorder constituted a severe impairment. R. 17. Third, through his date last insured, Plaintiff did not have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 17.

Prior to the fourth step, the ALJ found that, through his date last insured, Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with limitations limiting Plaintiff to simple, routine unskilled work involving 1- to 2-step tasks in a low-stress environment, defined as requiring no production pace, with only occasional interaction with the public, coworkers, and supervisors. R. 18. Regarding step four, Plaintiff is unable to perform any of his past relevant work. R. 22. The plaintiff is between 18 and 49, has a high school education and can communicate in English. R. 22. Transferability of job skills does not factor into the ALJ's calculation, because the Medical-Vocational Rules support a finding that the claimant is not disabled, whether or not he has transferrable job skills. R. 22. Fifth, through the date last insured, when considering Plaintiff's age, education, work experience, and RFC, there were significant numbers of jobs in the national economy that Plaintiff could perform. R. 22. These findings led the ALJ to conclude Plaintiff was not under a disability at any time from October 15, 2003, through the date of the ALJ's decision. R. 23.

### B. Plaintiff Assignments of Error

In his Memorandum in Support of his Motion for Summary Judgment, Plaintiff alleges the ALJ made two errors in this case. ECF No. 11. Plaintiff claims the ALJ committed reversible error by giving greater weight to the determinations of non-treating sources than the determinations of Plaintiff's three treating physicians; and by giving consideration to Ms. Corprew's testimony before the first ALJ, when she did not testify at the second hearing. *Id*. at 4, 9.

#### 1. The ALJ Properly Determined the Weight Given to Medical Opinions

The Plaintiff alleges that the ALJ's failure to give controlling weight to Plaintiff's treating physicians, and instead give controlling weight to non-treating sources, is reversible

error. Pl.'s Mem. In Supp. of Mot. for Summ. J. 4-9, ECF No. 11. Defendant argues that the ALJ's decision was reasonable because the treating source physicians largely only completed check-off forms, and that the ALJ properly weighed the evidence in front of him. Mem. In Supp. of Def't's Mot. for Summ. J. 10-12, ECF No. 13.

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians. Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However, a finding that a treating physician's opinion is not well-supported by medically acceptable clinical and diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. SSR 96-2, 1996 WL 374188, at *4 (S.S.A.).

The regulations require the ALJ to evaluate every medical opinion. Accordingly, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those factors are: (1) "[l]ength of treatment relationship and the frequency of examination;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Under the applicable regulations, the ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. §§ 404.1527(e), 416.927(e). Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2, 1996 WL 374188, at *5 (S.S.A.). This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the records as a whole to determine whether the conclusions reached are rational.'

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In this case, the ALJ followed the regulations above when he chose to discount the opinions of the treating source physicians. The check-off forms filled out by Drs. Aziz, Navarre, and Bryan all provide only limited information: that Plaintiff could not work, the period of time for which Plaintiff could not work, and their diagnosis. R. 360-68. As the ALJ stated, "all of these forms are based on mental impairments, but are not supported by medical records or explanations." R. 21. Thus, although they are treating physicians, none of them provide substantial evidence to justify their opinions. R. 21. Additionally, as Defendant addresses, opinions that conclude whether someone is disabled are never entitled to controlling weight, as

that is a decision left up to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1), *see, e.g. Phillips v. Colvin*, No. 2:13cv59, 2013 WL 6528849, *4 (E.D. Va. Dec. 11, 2013) ("Further, the treating physician's opinion will not be given controlling weight if the physician opines on an issue reserved for the Commissioner, including whether the claimant is disabled for employment purposes.").

Plaintiff argues that Dr. Aziz's report, which was prepared the same day as Dr. Aziz's check-box assessment Medical Evaluation form for TANF benefits, provides evidence to support his conclusions in the Medical Evaluation. Pl.'s Mem. In Supp. of Mot. for Summ. J. 8, ECF No. 11. However, the ALJ concluded that Dr. Aziz's notes from the Psychiatric Evaluation show symptoms that are "moderate at most," and not rising to the level of total disability. R. 21. He also states that it "appears to be based on the claimant's subjective complaints and self-reports, rather than actual findings and observations of the sources." R. 21. Dr. Aziz's evaluation is short, and states that while Plaintiff is anxious, hyperactive and fidgety and that he has hand tremors and difficulty concentrating and paying attention, he has no flight of ideas, no hallucinations, average intelligence, and intact memories, insight and judgment. R. 379. Based on the report, the ALJ's conclusions are reasonable.

Plaintiff also argues that even if the treating physician's opinions were properly discounted, the ALJ did not properly apply the six factors to determine the proper weight to give the check-box reports, citing *Winford v. Chater*, 917 F. Supp. 398, 401 (E.D. Va. 1996) (stating that "if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must then consider the weight to be given to the physician's opinion by applying five factors identified in the regulation"). Pl.'s Mem. In Supp. of Mot. for Summ. J. 7, ECF No. 11. This Court finds that the ALJ properly addressed the necessary factors in his opinion. In his

17

decision, the ALJ notes that aside from Dr. Aziz's Psychological Evaluation, the forms "are not supported by medical records or explanations," and have "no evidentiary support . . . at all."[7] R. 21. Since the record does not indicate length of treatment and frequency of examination by either Dr. Navarre or Dr. Bryan, nor is there any information regarding the nature and extent of their treatment relationships with the Plaintiff, the ALJ's reliance on their opinions' lack of support and inconsistency with the record are reasonable. Thus, there is substantial evidence that the ALJ properly discounted the opinions of the treating physicians.

The ALJ also properly gave "great evidentiary weight" to the state agency physicians. In his decision, he discussed the state agency physicians' determinations and evaluated their relationship to the record. R. 19. The ALJ concluded that their opinions were supported by medical evidence and consistent with the record overall, and that the new evidence in the record from after the state agency physicians' evaluations were consistent with the state agency physicians' opinions. R. 19. This Court concludes that there is substantial evidence in the record supporting the ALJ's decision to give the state agency physicians' opinions great weight.

### 2. The ALJ Did Not Err by Considering Ms. Corprew's Testimony

The Plaintiff alleges that the ALJ's brief citation to testimony from Angela Corprew during Plaintiff's first hearing before an ALJ constitutes reversible error, because the second ALJ explicitly stated that he would be conducting a de novo adjudication, and that he is "not bound by [the previous ALJ's] decision and it means nothing to" him. Pl.'s Mem. In Supp. of Mot. for Summ. J. 9-10, ECF No. 11; R. 32. This claim is without merit. Ms. Corprew's testimony is not part of the previous ALJ's decision; because she testified before the previous ALJ, her statements are evidence, not part of the previous ALJ's decision. It is agency policy for an ALJ

---

[7] Petitioner's reference to *Winford*, 917 F. Supp. at 403, stating that a treating physician's opinion should be offered more weight because it is able to provide a more detailed picture of a plaintiff's impairment, is not pertinent in this case, because the pictures provided by the treating physicians are not detailed.

to consider all evidence in the record, including statements by laypeople regarding the claimant's impairment. 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(H); 20 C.F.R. §§ 404.1512, 416.912. Furthermore, even if Ms. Corprew's testimony was part of the previous ALJ's decision, the ALJ's incredibly brief and independent discussion of her testimony would constitute harmless error.

This Court finds that there is substantial evidence that the ALJ's decision to discount the opinions of Plaintiff's treating physicians and place great weight on the decisions of the state agency physicians. Additionally, the ALJ's two-sentence discussion of Ms. Corprew's testimony does not constitute reversible error, because it is evidence that can be considered by the ALJ.

## V. **RECOMMENDATION**

Based on the foregoing analysis, it is the recommendation of this court that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED and DISMISSED and Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## VI. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

/s/
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
March 25, 2014